UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------- x
                                                      :
DANIEL PAUL MARCILLE                                  :          3:17 CV 1620 (RMS)
                                                      :
V.                                                    :
                                                      :
NANCY A. BERRYHILL,                                   :
ACTING COMMISSIONER OF                                :
SOCIAL SECURITY[1]                                    :          DATE: NOV. 15, 2018
                                                      :
----------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

Disability Insurance benefits ["DIB"].

I.     ADMINISTRATIVE PROCEEDINGS

On or about August 4, 2014, the plaintiff filed an application for DIB benefits claiming he

has been disabled since December 9, 2014,[2] due to degenerative disc disease, atrial fibrillation,

arthritis, diabetes, high blood pressure, high cholesterol, and sleep apnea. (Certified Transcript of

Administrative Proceedings, dated November 29, 2017 ["Tr."]   184-85, 212).   The plaintiff's

application was denied initially (Tr. 110-13), and upon reconsideration. (Tr. 116-18). On February

25, 2015, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 120-

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  The Federal
Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. 3349(b); accordingly, as
of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties
and functions not reserved to the Commissioner of Social Security.

[2] At his hearing, the plaintiff's attorney amended the plaintiff's onset date from December 9, 2013 to December 9,
2014.  (Tr. 45).

22), and on June 16, 2016, a hearing was held before ALJ Alexander Borré, at which the plaintiff and a vocational expert testified. (Tr. 39-85; *see* Tr. 143-53, 169-70, 174-75). On September 23, 2016, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 14-31). On September 30, 2016, the plaintiff filed a request for review of the hearing decision (Tr. 179), and on August 1, 2017, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On September 27, 2017, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on December 11, 2017, the defendant filed her answer and administrative transcript, dated November 29, 2017. (Doc. No. 10). On February 12, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge; the case was transferred to Magistrate Judge Joan G. Margolis. (Doc. No. 21). On April 27, 2018, the plaintiff filed his Motion to Reverse (Doc. No. 24), with brief in support (Doc. No. 24-1 ["Pl.'s Mem."]), and the Joint Stipulation of Facts (Doc. No. 24-2). On May 1, 2018, this case was reassigned to this Magistrate Judge. (Doc. No. 25). On August 27, 2018, the defendant filed her Motion to Affirm (Doc. No. 29), and on September 11, 2018, the plaintiff filed a Waiver of Reply. (Doc. No. 30).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 24) is *denied*, and the defendant's Motion to Affirm (Doc. No. 29) is *granted*.

II.    FACTUAL BACKGROUND

A.    HEARING TESTIMONY

As of the date of his hearing in 2016, the plaintiff was fifty-four years old (Tr. 44), and he was living with his wife and twenty-two year old son. (Tr. 45-46). His wife was working full-time, but, at the time of the hearing, his son was not working. (Tr. 46).

The plaintiff graduated high school and worked as a warehouse worker for a supply company (Tr. 47, 233, 277, 296, 306), then as an assistant night manager at Quiznos (Tr. 48, 233, 277, 296, 306), and, most recently, as an assistant catering chef for Sodexo. (Tr. 48-49, 233, 277, 296, 306). He left his last job in December 2014 due to pain in the middle of his back. (Tr. 49, 61-62).

The plaintiff had his right hip replaced in 2010 and his left hip replaced in 2014. (Tr. 50). He has used a cane since he had those hip replacements; he uses it to walk far distances or to go grocery shopping. (Tr. 53-54). The plaintiff testified that he feels pain in his hips after walking five minutes (Tr. 51), or when walking up "[a]ny kind of like incline[.]" (Tr. 52). For a period of time, he attempted to walk on a treadmill for exercise, but stopped because of the pain. (Tr. 65). His hip pain makes it difficult to walk or stand. (Tr. 66).

He opined that he can sit for fifteen minutes and could "[p]robably" lift and carry ten pounds. (Tr. 55). He also testified that he "get[s] bummed out" and "just [does not] feel like doing anything." (Tr. 56). He spends his days "sit[ting] around and watch[ing] TV." (Tr. 56). He lies down two or three times a day, "depending on how much pain that [he has]." (Tr. 58). He drives, but not for longer than a half hour, as his back starts to hurt. (Tr. 46-47).

The plaintiff does the grocery shopping, prepares meals for his family, and does "a little" cleaning, but it bothers his back such that he has to "sit and relax afterwards or [he has his] son put [his] TENS[3] unit on." (Tr. 57). He uses the TENS unit about once a day for about an hour. (Tr. 59). According to the plaintiff, he has to stop and rest after "probably a half hour of doing grocery shopping[.]" (Tr. 55). His son does the yard work and takes laundry out of the dryer, but the plaintiff puts laundry in the washer and dryer. (Tr. 57).

---

[3] TENS stands for Transcutaneous Electrical Nerve Stimulation; a TENS unit is used for pain relief and treatment of pain and nerve related pain conditions. *See* https://www.tensunits.com/ (last visited Nov. 13, 2018).

He has taken Oxycodone "[o]ff and one since 2010" and has received injections in his lower back since 2012. (Tr. 59-61, 63). His insurance denied coverage for injections to address pain that he has in the middle of his back. (Tr. 63). The plaintiff also has pain in his neck which makes it difficult for him to sleep at night. (Tr. 64). He testified that his medications cause him to feel tired. (Tr. 52, 54).

The vocational expert classified as "light" work the plaintiff's past employment as a fast food cook and manager, and as "heavy work" his job as a sorter and packer in a warehouse. (Tr. 68). Though his past work as a manager "sounds like he was given the title, . . . in terms of his duties," he was performing them on a "semiskilled or unskilled level." (Tr. 78). The vocational expert testified that his skills as a fast food cook and manager would transfer to "sedentary" work, like the work of an assignment clerk or telemarketer. (Tr. 70). However, if the plaintiff was limited to unskilled work or simple and repetitive tasks, he would not be able to perform these jobs. (Tr. 76). The vocational expert further explained that a person limited to light level work, but who could not climb ladders, ropes or scaffolds or tolerate exposure to hazards, could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, could not tolerate temperature extremes, and was further limited to frequent overhead reaching, could perform the plaintiff's past work as a fast food manager, as well as work as a "shipping and receiving weigher[,]" a mail clerk, and a "splicer[.]" (Tr. 71-72).

As the vocational expert explained, if such an individual was required to carry a cane to walk 100 feet or to walk on uneven surfaces, such a person could perform the work of an assistant manager "as long as productivity and expectations were not compromising this ability." (Tr. 73). Additionally, "[i]f the person could stand and move without the cane while doing" the work of a shipping and receiv[ing] [clerk], mail clerk, and splicer, "chances are productivity expectations

would not be compromised and, therefore, no significant reasonable accommodation would be necessary." (Tr. 73). The vocational expert opined that, if the exertional level was reduced to sedentary, "at least 50 percent of those jobs would" be able to be performed, depending on "employer and industry expectations." (Tr. 74-75). An individual who is off task 20 percent of the workday, however, would not be employable. (Tr. 75).

## B. MEDICAL HISTORY

### 1. RECORDS PRIOR TO ONSET DATE

As discussed above, the plaintiff's amended onset date of disability is December 9, 2014. (Tr. 45). There are volumes of records pre-dating this date, all of which the Court has reviewed. (*See* Tr. 748 (December 2009 cardiology treatment with Dr. Jan R. Paris for chest pain); Tr. 443-44 (abnormal electrocardiogram, showing atrial fibrillation with a "competing junctional pacemaker"); Tr. 378-82, 388-99, 585-90, 599-603, 611-24, 749-56; *see generally* 349-52, 378-82, 388-89, 393-94, 591-94 (January, March, June and December 2014 treatment with Dr. Paris for atrial fibrillation, for which he was asymptomatic; underwent unsuccessful cardioversion);[4] Tr. 347-48, 373-77 (March and May 2014 polysomnogram; moderate obstructive sleep apnea)). Additionally, the plaintiff has a long treatment history with his orthopedist, Dr. Russell Chiappetta, who began treating plaintiff in March 2012, and saw him on an almost monthly basis thereafter.[5] (*See* Tr. 517-19 (March and April 2012: treatment for left wrist pain and "[c]hronic low back syndrome with acute exacerbation"; limited range of motion noted); Tr. 513-17, 521 (May, June and August 2012: treatment of low back pain; persistent pain and limitation; "[s]low" to

---

[4] *See also* Tr. 390-92, 523-24 (left hip surgery cancelled due to atrial fibrillation).

[5] Additional records are discussed in Section II.B.2.*infra*.

"plateaued" response to therapy; unable to return to work); Tr. 470-71 (June 2012 MRI of lumbar spine: disc protrusion at L1-L2, disc bulge at the L2-L3 level resulting in mild central canal stenosis); Tr. 509-11 (September, October and November 2012 (chronic low back syndrome with facet arthropathy); Tr. 508 (December 2012 report of improvement and increased range of motion); Tr. 501-05, 507 (2013 records reflecting back pain from shoveling snow; back strain)).

The plaintiff also has a treatment history dating back to July 9, 2012 with Dr. Eric Grahling of Comprehensive Pain Management of Central CT, for lumbago and facet syndrome, for which he, and his APRN, Shawn Putnam, treated the plaintiff through August 2014 with a series of facet joint injections, nerve root ablations, a TENS unit, and Vicodin. (Tr. 472-74; *see* Tr. 475, 477, 480-81, 487, 490, 492-93).[6] During that time period, the plaintiff noted improvement in his ability to complete daily activities. (Tr. 476-94).

In August and December 2012, the plaintiff was seen by his primary care physician, Dr. Othman El-Alami, for his treatment of hypertension, diabetes mellitus, and dyslipidemia; at the time, the plaintiff weighed 355 pounds. (Tr. 448). He was also diagnosed with low back pain, and Dr. El-Alami recommended diet and exercise. (Tr. 448).

## 2. RECORDS FROM THE ONSET DATE OF DISABILITY

Within the year preceding the plaintiff's onset date of disability, the plaintiff underwent surgery on his left hip, and continued to receive pain management treatment for his back pain, as discussed herein.

On March 18, 2014, the plaintiff underwent a total hip arthroplasty for severe degenerative joint disease of the left hip by Dr. Chiappetta at The Hospital of Central Connecticut. (Tr. 359-63, 520-22; *see* Tr. 344 (X-rays), 446 (pre-op physical)). The plaintiff was scheduled to undergo this

---

[6] Additional records are discussed in Section II.B.2. *infra*.

surgery on January 7, 2014, but the surgery was canceled when the plaintiff went into atrial fibrillation in the operating room. (See Tr. 390-92, 523-24). As the limited treatment records related to atrial fibrillation reveal, the plaintiff is asymptomatic. The plaintiff remained admitted for physical therapy following the surgery (Tr. 332-43, 371-74), and he was released on March 21, 2014. (*See* Tr. 357).

On March 24, 2014, he returned to Dr. Chiappetta after he had fallen at his rehabilitation facility; Dr. Chiappetta sent him for an ultrasound to rule out a blood clot. (Tr. 500). The ultrasound of the plaintiff's left lower extremity was performed; it showed "no evidence of a DVT[.]" (Tr. 469, 530; *see also* Tr. 531). On April 21, 2014, Dr. Chiappetta noted continued improvement; the plaintiff had hip good range of motion of the left hip, persistent weakness of the abductors, "2+ swelling[,]" and overall satisfactory recovery. (Tr. 499).

Between May 15 and August 28, 2014, the plaintiff received physical therapy for a total of sixteen sessions following his left total hip replacement. (Tr. 532-54). Upon discharge, the plaintiff's functional mobility as it related to activities of daily living was limited primarily due to "(1) residual [range of motion] and strength limitations status post left hip replacement[,] and (2) significant back pain and dysfunction." (Tr. 535).

Dr. Chiappetta's notes from May 19, 2014 reflect that the plaintiff was "doing markedly better[.]" (Tr. 498). On June 12, 2014, the plaintiff returned to Dr. Grahling who noted that the plaintiff's "[l]ow to mid back pain returned." (Tr. 491). Four days later, Dr. Chiappetta recommended that the plaintiff continue physical therapy, and he prescribed Hydromorphone "since Oxycodone [did not] seem to control his back pains." (Tr. 497).

On July 9 and 10, 2014, the plaintiff received medial branch nerve blocks to the bilateral lumbar facets performed by Dr. Grahling. (Tr. 492-93). On July 11, 2014, Dr. Chiappetta noted

that the plaintiff was walking with a slight antalgic gait, he had continued weakness of abduction, continued limitation in internal arcs of rotation, "[d]istinct pain on palpation over the lower lumbar spine" with continued painful range of motion, and "[d]istinct pain on palpation over the mid thoracic spine" with painful range of motion. (Tr. 496).  Dr. Chiappetta assessed chronic low back syndrome and "[s]low but satisfactory recovery" of his left hip as that recovery was limited "because of his chronic back problem."  (Tr. 496).[7]

On August 7, 2014, the plaintiff complained of lower back pain despite repeat facet joint injections, although his lower back pain was improved by sixty percent, and his activities of daily living were improved.  (Tr. 494).  On examination, APRN Putnam[8] found lumbar facet joint tenderness and "++ mod[erate] bilat[eral] lower thoracic facet tenderness[,]" and he noted that the plaintiff had lost 50 pounds in the past seven months. (Tr. 494).

On August 8, 2014, Dr. Chiappetta saw the plaintiff for "trochanteric type pains[]"; he reported that walking with a cane reduced his symptoms. (Tr. 495).  On examination, the plaintiff had "[d]istinct pain on palpation over the greater trochanter[,]" continued limitation with internal arcs of rotation, and tightness of the iliotibial band. (Tr. 495). Dr. Chiappetta assessed a "[s]low but satisfactory recovery" following total hip replacement (Tr. 495), and he provided the plaintiff

---

[7] From July 12 to 16, 2014, the plaintiff was treated in-patient at The Hospital of Central Connecticut for fever and left testicular pain that was diagnosed as "left orchitis and epididymitis associated with evidence of systemic inflammatory response syndrome" and sepsis.  (Tr. 383-87, 400-42, 604-08). During admission, the plaintiff had an abnormal ECG, showing borderline left axis deviation and atrial fibrillation. (Tr. 399).  On July 21, 2014, the plaintiff was examined by Dr. El-Alami, for primary care treatment; he was advised to diet, exercise and lose weight.  (Tr. 445, 828). On September 11, 2014, the plaintiff received a scrotal ultrasound that revealed moderate left varicocele with some areas of thrombosis and no suspicious mass. (Tr. 712).  On October 10, 2014, a surgical pathology report indicated that the plaintiff had descending colon polyps and polypoid material. (Tr. 835).

[8] The treatment records from Comprehensive Pain Management of Central Connecticut reflect that Dr. Grahling administered the injections for the plaintiff's pain management, and, "Shawn Putnam, APRN with Dr. Grahling immediately available[,]" treated the plaintiff at his other appointments.  (*See e.g.*, Tr. 494).

with a note indicating he would not be able to return to work until at least September 6, 2014. (Tr. 529).

On September 5, 2014, the plaintiff was examined by Dr. Chiappetta for "intermittent discomfort[]" and lack of motion in the left hip post surgery, as well as increasing neck pain that Dr. Chiappetta diagnosed as "[c]hronic cervical strain." (Tr. 686).  Dr. Chiappetta assessed "[s]low but satisfactory recovery with residual arthrofibrosis[]" that prevented the plaintiff, "at [that] point[,] [from] return[ing] to the work force."  (Tr. 686). Dr. Chiappetta noted that the plaintiff was pursuing social security disability "which [Dr. Chiappetta felt was] appropriate."  (Tr. 686).

On September 9, 2014, the plaintiff received medial branch nerve blocks to the bilateral lumbar facets under the care of Dr. Grahling. (Tr. 555, 727, 834).  On September 23, 2014, the plaintiff reported to Dr. Grahling that the facet injections provided no relief, and that he was using a cane for left hip pain. (Tr. 556, 728). Dr. Grahling prescribed pool therapy, as well as Gabapentin for pain. (Tr. 556, 728).

On October 15, 2014, the plaintiff underwent MRI imaging of the thoracic back, showing multilevel disc degenerative changes, "spinal canal without significant neural foraminal narrowing[,]" and "no acute osseous findings." (Tr. 569-70, 854-55; *see* Tr. 574-77).  Five days later, the plaintiff reported to Dr. Grahling that he had no relief from facet injections, that he was experiencing a constant knot in his midback, that he was using a cane for left hip pain, and that he had chronic pain. (Tr. 557). Dr. Grahling recommended a possible upgrade of his TENS unit and a muscle stimulator for chronic pain and atrophy of low back muscles. (Tr. 557).[9]  On November

---

[9] In November and December 2014, the plaintiff underwent thyroid biopsies upon referral from Dr. El-Alami; the results revealed a "follicular cytology[]" from which malignancy could not be "excluded."  (Tr. 559, 780-90, 829-21, 832-33. 839).  Dr. Sarma recommended a thyroidectomy; the plaintiff opted for observation. (Tr. 839).

17, 2014, the plaintiff returned to APRN Putnam; he had mild to moderate bilateral mid back tenderness and "++ mild bilat[eral] lumbar facet tenderness[.]" (Tr. 558, 734, 843).

On December 8, 2014, the plaintiff was seen by Dr. Chiappetta for continued "exquisite discomfort in the neck with intermittent paresthesia" and discomfort in the lumbar region. (Tr. 687, 836). Upon examination, the plaintiff had "distinct pain on palpation over the lower cervical spine at C4-C5, as well as pain along the trapezius[,]" "[p]ositive Adson test on right[,]"and "good" range of motion in the hips. (Tr. 687, 836).

On December 11, 2014, MRI imaging of cervical spine revealed "central disc protrusion" at T1-T2, "causing some degree of effacement of [the cerebrospinal fluid] and no cord compression." (Tr. 651-52, 773-74).

On December 15, 2014, the plaintiff was examined by Dr. Ellison Berns, an electrophysiologist for a consult of asymptomatic persistent atrial fibrillation. (Tr. 583-84, 755-56; see Tr. 585-86 (referral by Dr. Paris)). Dr. Berns assessed asymptomatic atrial fibrillation, prescribed a 24-hour Holter monitor, and recommended repeat echocardiograms every several years to ensure the plaintiff was not in the early stages of developing cardiomyopathic process. (Tr. 584). While wearing the Holter monitor, the plaintiff performed the following activities: folded laundry, went "down to workshop," climbed ten steps, went for a one-mile walk, wrapped gifts, vacuumed rugs, cleaned the bathroom, and mopped the floors. (Tr. 624).

On December 17, 2014, the plaintiff was seen by Dr. Chiappetta for discomfort and weakness in his neck. (Tr. 689). Dr. Chiappetta assessed a "[c]ervical strain-type pattern with prominent spondylosis[]" and impingement of the right shoulder for which he administered an injection of dexamethasone and lidocaine. (Tr. 689). The next day, the plaintiff was seen at Grove

Hill Medical Center for a follow up for his neck pain. (Tr. 714). He reported that he has pain when walking and that he "cut back on the walks[.]" (Tr. 714).

On January 5, 2015, the plaintiff reported to APRN Putnam that he did not have relief from his injections and that he had a constant knot and tightness in his midback. (Tr. 729, 735). Specifically, on January 7, 2015, the plaintiff was seen by Dr. Chiappetta for right shoulder pain, and on examination, he had distinct pain on palpation at the tip of the acromion and subcromial space, pain at 90 degrees abduction and forward flexion with painful internal/external rotation, and pain on stressing the supraspinatus tendon. (Tr. 690). A week later, he completed initial physical therapy assessment at Southington Care Center, for treatment of right shoulder pain. (Tr. 703-704).

On January 21, 2015, Dr. Grahling administered lumbar facet loading injections on the left, S1 facet joint bilaterally. (Tr. 736). On January 22, 2015, the plaintiff was examined by Dr. Grahling, who diagnosed lumbar facetogenic pain and lumbar spondylosis and administered a lumbar facet loading injection on the right. (Tr. 730, 737).

On February 6, 2015, Dr. Chiappetta referred the plaintiff for an MRI. (Tr. 691). On February 14, 2015, MRI imaging of the right shoulder revealed "[v]ery small focal full-thickness to near full-thickness small distal tear anterior supraspinatus[[,]" with "[m]arked AC joint degenerative change[,]" [e]arly osteoarthritis noted in glenohumeral joint[,]" and a "[s]uspicion of labral tear[.]" (Tr. 639-40, 791-92; *see* Tr. 643-48). Four days later, the plaintiff returned to Dr. Chiappetta with "considerable" right shoulder discomfort and weakness, and upon examination, the plaintiff had painful range of motion, full motion achievable with some difficulty, and weakness of the supraspinatus tendon. (Tr. 692).

On February 19, 2015, the plaintiff was seen by Dr. Robert Belniak, an orthopedist; on examination, the plaintiff was "markedly obese" at 340 pounds, exhibited abduction of the right

shoulder to 100 degrees actively, had moderately positive impingement symptomatology with mildly positive drop arm signs, and tender "a.c. joint[,]" tenderness along the biceps sheath, and "a positive Yergason test." (Tr. 635). Dr. Belniak concluded that the plaintiff's MRI was consistent with a "near full[] thickness to full thickness tear of his supraspinatus and infraspinatus[,]" with "significant degenerative disease of the a.c. joint, and interstitial changes of the biceps tendon with possible labral pathology[]"; his diagnostic impression was rotator cuff tear of right shoulder, arthritis, and "[p]robable biceps labral complex disease." (Tr. 635, 693, 845).

On February 26, 2015, the plaintiff reported to APRN Putnam that his back pain was 80% improved and that he had improved range of motion. (Tr. 706, 731, 738, 844). The examination showed minimal lumbar facet tenderness, and Putnam assessed low to mid back facet joint pain with good relief. (Tr. 706, 731, 738, 844).

On March 2, 2015, the plaintiff underwent arthroscopic surgery of the right shoulder with Dr. Robert Belniak. (Tr. 636-37; see also Tr. 634-35, 693-94, 719-20, 845). Specifically, Dr. Belniak performed arthroscopic extensive debridement, subacromial decompression, distal clavicle resection, and biceps tenotomy of the plaintiff's right shoulder. (Tr. 636-37). Seven days later, the plaintiff had "minimal pain[,]" and he exhibited good elbow and wrist range of motion and good grip strength. (Tr. 633).

On March 13, 2015, the plaintiff began physical therapy at Southington Care Center for his right shoulder and arm, to improve his range of motion, allow his right arm to swing freely during gait, and to sleep in bed 2-3 hours per night, and eventually, to return to driving using his right hand on a steering wheel pain free. (Tr. 707-08; see Tr. (Tr. 709-11).

On April 23, 2015, the plaintiff was examined by APRN Putnam, for follow up after bilateral lumbar facet injections secondary to chronic pain, which were 80% effective at improving his back pain. (Tr. 726, 739, 801). The plaintiff reported worsening mid-back pain which limited his activity and affected his mood and, upon examination, Putnam noted low to mid back facet joint pain. (Tr. 726, 739, 801).

The plaintiff completed 22 sessions of physical therapy for his right shoulder from April 24 through May 15, 2015 (Tr. 747), and upon discharge, the plaintiff reported improved pain but some difficulty and soreness reaching and lifting (i.e., lifting a moderately heavy bag of groceries, putting dishes away, reaching for items in middle of tables, etc.), and he exhibited full active abduction and flexion range of motion, and muscle strength of 4/5. (Tr. 747).

On May 5, 2015, the plaintiff returned to Dr. Belniak, who noted that the plaintiff had "very good progress following decompression of right rotator cuff[,]" mild pain, the ability to abduct his shoulder overhead without difficulty, and minimal impingement signs. (Tr. 631, 697).

On June 4, 2015, the plaintiff was examined by William Pesce, D.O., for an initial consultation for pharmacologic and pain management, upon referral by Dr. Grahling. (Tr. 814). Upon examination, the plaintiff rose slowly from a chair and ambulated slowly to the examination table. (Tr. 814). Dr. Pesce noted "[d]iffuse tenderness with multiple trigger points along the thoracolumbar paraspinals" without evidence of spasm, and his "[s]eated straight leg raise [was] negative." (Tr. 814-15). According to Dr. Pesce, the plaintiff has had a long history of chronic back pain, he experienced minimal relief from multiple conservative treatments, and he has been opioid dependent for "many years[.]" (Tr. 815). His history of bilateral hip replacement surgery, and right shoulder surgery "complicated matters." (Tr. 815). The plaintiff rated his pain as a five

on the scale to ten and stated that the pain was "minimal" during periods of sitting and rest, and worsened with activity. (Tr. 815).

On July 7, 2015, Dr. Pesce noted that Opana did not help the plaintiff who was experiencing increased pain and fatigue. (Tr. 816, 847). Dr. Pesce prescribed Oxycodone, four times a day. (Tr. 816, 847).

On August 10, 2015, the plaintiff was seen by APRN Putnam for a follow up after receiving bilateral lumbar facet injections; the plaintiff reported that his mid-back pain limited his activity and affected his mood. (Tr. 802).

On September 1, 2015, the plaintiff reported to Dr. Pesce that he was doing better with Oxycodone, and upon examination, the plaintiff had functional range of motion of the thoracolumbar spine, some pain at end range of flexion and extension, and diffuse tenderness along the mid thoracic and lumbar paraspinals with trigger points along this area but no spasm. (Tr. 817). Dr. Pesce assessed that, overall, the plaintiff was "generally doing well" with regard to thoracolumbar disease, hip arthritis, and mid back pain. (Tr. 817).

On September 15 and 16, 2015, the plaintiff received injections to the right and left lumbar facet loading joints and bilateral S1. (Tr. 803-04, 848). On October 22, 2015, the plaintiff reported to APRN Putnam that he "felt better initially" following the September injections, but he no longer felt better, and his mornings and nights were "still rough." (Tr. 806). Upon examination, the plaintiff exhibited "++lumbar facet joint tenderness bilat[erally.]" (Tr. 806).

On October 26, 2015, APRN Putnam completed a medical source statement on behalf of the plaintiff in connection with his application for benefits. (Tr. 740-45, 820-26). According to Putnam, the plaintiff could lift or carry 10 pounds continuously, and 20 pounds occasionally, which activity is limited by "severe mid to lower back pain with limited [range of motion.]" (Tr. 740,

820). The plaintiff could sit for thirty minutes, and stand or walk for fifteen minutes at a time, and could sit for four hours in a work day, stand for one hour, and walk for thirty minutes. (Tr. 741, 821). The remaining time in an eight-hour work day would be spent lying down. (Tr. 741, 821). The plaintiff had the ability to occasionally reach, push and pull, and could continuously handle, finger and feel; he could frequently use his feet for foot controls bilaterally, but was limited because he could not sit in one position for too long. (Tr. 742, 822). Additionally, the plaintiff could never climb ladders, stoop, kneel, crouch or crawl, and could occasionally climb stairs or balance; these activities were limited secondary to pain. (Tr. 743, 823). In addition, the plaintiff could not use unprotected heights, tolerate dust, odors or fumes, extreme cold or heat, or vibrations. (Tr. 744, 824).

On October 29, 2015, the plaintiff reported to Dr. Paris that he tried to exercise several times per week on the treadmill and that he did not experience any angina. (Tr. 759-60, 841-842). Dr. Paris noted that a coronary angiogram did not show any evidence of ischemic heart disease and follow up echocardiograms confirmed his LV function was normal. (Tr. 759, 841).

On November 16, 2015, the plaintiff underwent an MRI of the lumbar spine secondary to severe back pain radiating to the legs. (Tr. 746, 796-97, 859-60). The results revealed mild spondylosis at T12-L3, "[d]isc desiccation signal and narrowing at L1-L2, L2-L3, and to some extent L3-4 unchanged[,]" L1-L2 "[d]iffuse disc bulge with small central protrusion and unchanged central tear[,]" "[m]inimal compression both sides of thecal sac[,]" and L2-L3 "[d]iffuse disc bulge and minimal acquired central canal stenosis[,] [s]mall broad-based protrusion with trace compression both sides of thecal sac." (Tr. 746, 796, 859). Additionally, there was "[d]iffuse disc bulge and facet arthropathy, minimal or trace central canal stenosis" at L3-L4 and L4-L5, and facet arthropathy at L5-S1. (Tr. 746, 796). The MRI overall impression showed central

protrusions noted at L1-L2 and L2-L3 and "[s]everal levels of minimal acquired central canal stenosis." (Tr. 797, 860).

On November 20, 2015, the plaintiff was examined by APRN Putnam who noted "++ lumbar facet joint tenderness bilat[erally.]" (Tr. 807, 849). He noted the plaintiff's MRI looked "good" and showed minimal protrusion at the L2-3 levels (Tr. 807, 849). He planned to pursue therapeutic facet joint injections as the plaintiff had "good relief with lumbar facet" injections in the past, and his mid back was "better" with Oxycodone. (Tr. 807, 849).

On December 22, 2015, the plaintiff returned to Dr. Pesce, at which time he reported that he was driving, was independent with simple activities of daily living, and ambulated without an assistive device. (Tr. 818, 850). On examination, he had moderate tenderness along the mid and lower lumbar paraspinals with small trigger points and no evidence of spasm. (Tr. 818, 850). He was able to go up on his heels and toes to do a modified knee bend. (Tr. 818, 850). Dr. Pesce assessed that, overall, the plaintiff was "generally doing well." (Tr. 818, 850).[10]

On January 12, 2016, Dr. Grahling administered lumbar facet joint injections to the L3-5 level bilaterally. (Tr. 808). On January 27, 2016, the plaintiff reported to APRN Putnam that he had no relief from the facet joint injection. (Tr. 809, 851). On February 1, 2016, the plaintiff was examined by Dr. Grahling who administered injections to the bilateral lumbar facet joints. (Tr. 810, 812).

On February 16, 2016, APRN Putnam noted that the plaintiff had limited range of motion which he attributed to low to mid back facet joint pain; he did not believe more injections were "indicated." (Tr. 811). APRN Putnam recommended that the plaintiff continue medication

---

[10] On January 5, 2016, an ultrasound of the plaintiff's thyroid revealed a newly appreciated small right nodule. (Tr. 798-99).

management, as the plaintiff was walking on a treadmill daily, was on a TENS unit, and was taking Oxycodone, Gabapentin, Cymbalta, and Xarelto. (Tr. 811, 813).

On March 1, 2016, the plaintiff was examined by Dr. Pesce, at which time he was taking Oxycodone four times a day, which reduced his pain to a four or five on a scale to ten. (Tr. 819). The plaintiff reported that he had pain, but he was independent, ambulating with a straight cane, and was able to drive. (Tr. 819). On examination, he had range of motion to one-half forward on flexion, extension to neutral to one quarter, and side bending one quarter, and he had "[d]iffuse tenderness along the mid and lower lumbar paraspinals with small trigger point at the right L4 multifidus." (Tr. 819). Dr. Pesce concluded that the plaintiff overall was "stable" on his current pharmacologic regimen. (Tr. 819).

On April 14, 2016, Dr. Grahling and APRN Putnam co-signed a medical source statement on behalf of the plaintiff which was identical to the form signed by only APRN Putnam on October 26, 2015, with the addition that the limitations noted in April 14th statement refer back to at least March 2012. (Tr. 820-26). On April 26, 2016, the plaintiff was examined by APRN Putnam; the plaintiff reported continued pain and used a cane during the session. (Tr. 852).

On May 10, 2016, the plaintiff reported to Dr. Pesce that the Oxycodone reduced his pain by fifty percent; he "generally" used a cane to walk; he was very limited moving around his home because of pain in his back; and he continued to drive. (Tr. 853). On examination, the plaintiff had a "[t]rigger point at the right L4 multifidus and mild spasm along the left lumbar paraspinals." (Tr. 853). Dr. Pesce diagnosed lumbosacral disease and concluded that the plaintiff's "ongoing medical issues and pain issues" have kept him out of the work force; given his lumbosacral disease, it was highly unlikely he could return back to his previous employment or any employment that would

involve repetitive bending, stooping, standing, or sitting for longer periods. (Tr. 853). The plan was to continue with pain medication. (Tr. 853)

## III.  THE ALJ'S DECISION

Following the five-step evaluation process,[11] the ALJ found that the plaintiff has not engaged in substantial gainful activity since December 9, 2014, his amended alleged onset date. (Tr. 20, citing 20 C.F.R. § 404.1571 *et seq.*). The ALJ concluded that the plaintiff has the following severe impairments: degenerative joint disease status post left hip arthroplasty, degenerative joint disease status post right shoulder arthroscopy, obesity, obstructive sleep apnea, degenerative disc disease in the thoracic and lumbar spine, and atrial fibrillation (Tr. 20-21, citing 20 C.F.R. §§ 404.1520(c)), but that the plaintiff does not have an impairment or combination of impairments that meet or medically equals the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21-22, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). The ALJ found that, after careful consideration of the entire record, the plaintiff has the residual functional capacity ["RFC"] to perform a full range of light work as defined in 20 C.F.R. § 404.1567(b) except no climbing of ladders, ropes or scaffolding, occasional climbing of ramps and stairs and occasional balancing, stooping, kneeling, crouching and crawling. (Tr. 22-29). Additionally, the

---

[11] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

ALJ concluded that the plaintiff cannot tolerate exposure to temperature extremes, or hazards, and concentrated exposure to dust, fumes or gases; he is restricted to only frequent overhead reaching with the right dominant upper extremity and needs the option to use a cane for ambulating distances greater than 100 feet or over uneven surfaces, but can stand without the use of a cane. (Tr. 22-29). The ALJ concluded that the plaintiff is capable of performing his past relevant work as a fast food manager, which work does not require the performance of work-related activities precluded by the claimant's RFC. (Tr. 29-30, citing 20 C.F.R. § 404.1565). Additionally, the ALJ concluded that "[a]lthough the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that he is also able to perform, including as a shipping and receiving clerk; mailing clerk; and splicer. (Tr. 30-31). Accordingly, the ALJ concluded that the plaintiff was not under a disability from December 9, 2014, through the date of his decision. (Tr. 31, citing 20 C.F.R. § 404.1520(f)).

## IV.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d

Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    <u>DISCUSSION</u>

The plaintiff contends that the ALJ erred at Step 4 of the sequential process, in that he made multiple and contradictory findings regarding the plaintiff's RFC. Although the ALJ acknowledged that the plaintiff's age and past relevant work placed him in the category of sedentary exertional level work, he denied the plaintiff benefits based upon the vocational expert testimony regarding jobs available at the light exertional level. (Pl.'s Mem. at 2, 6-8). Additionally, the plaintiff argues that the ALJ violated the treating physician rule in two ways. First, he failed to assign substantial weight to the plaintiff's primary care providers and failed to state good reasons for not doing so. (Pl.'s Mem. at 2, 8-18).  Second, he failed to develop the record, in that he failed to seek clarification from the claimant's treating physicians whose opinions he rejected due to "perceived inconsistencies in the record."  (Pl.'s Mem. at 2, 18-19).

The defendant argues that the ALJ's reference to sedentary work in his decision was a typographical error in that the ALJ's RFC finding, Step 4 finding, and alternate Step 5 finding "clearly identify that the ALJ found [the] [p]laintiff capable of a range of light work." (Def.'s Mem. at 9-10). Additionally, the defendant contends that the ALJ correctly weighed the medical and non-medical evidence (Def.'s Mem. at 11-20); and that the ALJ fully developed the record. (Def.'s Mem. at 20-23).

A.    THE ALJ DID NOT ERR IN HIS DISCUSSION OF THE PLAINTIFF'S RFC

In his decision, the ALJ concluded that the plaintiff's past work as a fast food manager was classified as light work; his work as an "[o]rder [p]icker" was classified as heavy work; and, his work as a caterer/sandwich maker was classified as medium work. (Tr. 29-30). The ALJ also acknowledged that the plaintiff, who was born in 1962, was "defined as an individual closely approaching advanced age[.]" (Tr. 30). The ALJ concluded that the plaintiff was capable of performing his past work as a fast food manager, which, as stated above, is classified as light work, as well as performing three representative light exertional occupations in the national economy. (Tr. 29-31). Additionally, the ALJ concluded that the plaintiff retained the RFC to "perform light work" with limitations he specified in his decision. (Tr. 22). Yet, in his decision, the ALJ also stated: "As a result of the claimant['s] spinal impairments and hip impairment, in combination with his obesity, I find that the claimant would be restricted to performing work at the sedentary exertional level," with the same limitations he specified in his initial RFC discussion. (Tr. 26).

It is clear from the context of the ALJ's decision, and the three separate findings -- the RFC finding, the Step Four finding, and the identification of additional light work in the alternate Step Five finding -- that the ALJ's reference to "sedentary" exertional level was a typographic error. Additionally, contrary to the plaintiff's argument (Pl.'s Mem. at 7), even if the ALJ found the

plaintiff limited to sedentary work, a finding of disabled would not be directed by the Medical-Vocational Guidelines. As the plaintiff acknowledges in his brief, and as the ALJ noted in his decision, "at all times pertinent hereto[,]" the plaintiff "was closely approaching advanced age" as defined in the Medical-Vocational Guidelines. (Pl.'s Mem. at 7); *see* 20 C.F.R. Pt. 404, Subpt. P, Appx 2, § 200.00(g). Under Medical-Vocational Rule 201.15, an individual closely approaching advanced age, with semi-skilled and skilled past work, with a high school education who could perform sedentary work with little-to-no vocational adjustment, would still be found not disabled. 20 C.F.R. Pt. 404, Subpt. P, Appx 2, Rule 201.15; (*see* Def.'s Mem. at 10). Thus, even if the plaintiff was limited to sedentary instead of light work, a finding of not disabled applies under Medical-Vocational Rule 201.15.[12]

Accordingly, as discussed above, in the context of the ALJ's decision, it is clear that the use of the word "sedentary" is a typographic error that does not change the outcome of the decision. *See Clark v. Colvin*, No. 13 CV 6628P, 2015 WL 1458628, at *15 (W.D.N.Y. Mar. 30, 2015) (concluding that, in light of the ALJ's use of the word sedentary in his RFC determination, the fact that the hypotheticals posed to the vocational expert all involved sedentary work, and the fact that sedentary positions were identified at Step 5, the ALJ's "inadvertentl[]" use of the term "light" rather than "sedentary" was a typographic error that does not necessitate remand). In this case, the existence of "one reference" to sedentary work in the body of his decision "'was merely a harmless typographical error [that] does not necessitate remand.'" *Clark*, 2015 WL 1458628, at *15 (quoting

---

[12] The plaintiff "incorrectly identifies Grid Rule 201.16," when "[i]n fact, it is Medical-Vocational Rule 201.15 that applies." (Def.'s Mem. at 10). To make matters more confusing, in his brief, the plaintiff argues that Medical Vocational Rule 201.06 "would create an entitlement for the plaintiff at sedentary." (Pl.'s Mem. at 7, n.2). The Court construes this argument to mean that, if the ALJ limited the plaintiff to sedentary work, Rule 201.06 would direct a finding of disability, which would mean that the distinction between the terms sedentary and light work, as it is used in his decision, would affect the ALJ's ultimate disability finding. However, Rule 201.06 applies to a person of "[a]dvanced age" with "[s]killed or semiskilled-skills [that are] not transferable." 20 C.F.R. Pt. 404, Subpt. P, Appx 2, Table No.1. As discussed above, and as the ALJ correctly noted in his decision, the plaintiff is "closely approaching advanced age" as defined in the Medical-Vocational Guidelines and, thus, Rules 201.09-201.16 apply.

*Wearen v. Colvin*, No. 13 CV 6189P, 2015 WL 1038236, at *13 (W.D.N.Y. Mar. 10, 2015); *see also Ebert v. Berryhill*, No. 16 CV 1386(WIG), 2018 WL 3031852, at *3, n.5 (D. Conn. June 19, 2018).

B.     THE ALJ DID NOT ERR IN HIS APPLICATION OF THE TREATING PHYSICIAN RULE AND HIS EVALUATION OF THE OPINION EVIDENCE

The plaintiff next argues that the ALJ violated the treating physician rule, in that he failed to assign substantial weight to the plaintiff's primary care providers' opinions and failed to state good reasons for not doing so. (Pl.'s Mem. at 2, 8-18). The defendant argues that the "consultants' opinions were consistent with the evidence in the medical record and provided substantial evidence in support of the ALJ's determination that [the] [p]laintiff retained the abilities reflected in the RFC assessment." (Def.'s Mem. at 14; *see* Def.'s Mem. at 11-14). Additionally, the defendant asserts that the ALJ did not err in his treatment of the opinions from Dr. Grahling and APRN Putnam (Def.'s Mem. at 15); the ALJ properly considered the plaintiff's activities of daily living (Def.'s Mem. at 15-16); and the ALJ appropriately considered the opinions of Dr. Pesce and Dr. Chiappetta, in light of the proper regulatory framework. (Def.'s Mem. at 16-19).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

In his decision, the ALJ addressed each of the opinions of the plaintiff's treating sources – Dr. Chiappetta, Dr. Grahling and APRN Putnam, and Dr. Pesce, and then he evaluated the opinions of the State Agency medical consultants. (Tr. 28-29). The plaintiff argues that the ALJ erred in his consideration of each of these opinions.

First, the ALJ afforded "little weight to the opinion of Dr. Chiappetta[]" on grounds that Dr. Chiappetta's "statements [were] simply conclusory statements and [were] not function-by-function assessments of the claimant's functional limitations[.]" (Tr. 28). As the ALJ appropriately noted, on September 5, 2014, Dr. Chiappetta opined that the plaintiff "may not return to the work force and his pursuit of disability was appropriate." (Tr. 28; *see* Tr. 686 ("It is my feeling at this point the patient may not return to the work force.")). Although the plaintiff has had a long treatment history with Dr. Chiappetta, dating back to March of 2012 (*see* Tr. 519), 20 C.F.R. § 404.1527(c)(2), Dr. Chiappetta did not offer an opinion on the plaintiff's functional ability, but rather, offered a general, conclusory opinion on the plaintiff's ability to work. The decision on the ultimate issue of disability is reserved for the Commissioner, 20 C.F.R. § 404.1527(d)(2), and thus, the ALJ is not required to accept Dr. Chiappetta's opinion. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative."). That said, while the

plaintiff "is not entitled to have [Dr. Chiappetta's] opinion on the ultimate question of disability be treating as controlling, . . . [he] is entitled to be told why the Commissioner has decided . . . to disagree with [Dr. Chiappetta]." *Snell*, 177 F.3d at 134.

As discussed above, Dr. Chiappetta performed a total hip arthroplasty on the plaintiff on March 18, 2014 (*see* Tr. 359-63, 520-22), after which he continued to note the plaintiff's improvement (Tr. 498), as well as the plaintiff's limitations due to his "chronic back problem." (Tr. 496; *see also* Tr. 496-97). His notes reflect that the plaintiff's "[s]low but satisfactory recovery with residual arthrofibrosis[]" prevented the plaintiff from returning to work. (Tr. 686). In his decision, the ALJ appropriately explained that Dr. Chiappetta's opinion "appears to be related to the claimant's functional limitations following his hip surgery and is inconsistent with the treatment notes showing significant improvement in the claimant's hip following surgery with typically normal findings on examination." (Tr. 28); *see* 20 C.F.R. § 404.1527(c)(2); *Selian*, 708 F.3d at 417 (considering the amount of medical evidence supporting an opinion, and the consistency of that opinion with the remaining medical evidence).

Additionally, while the plaintiff is correct that Dr. Chiappetta also treated the plaintiff for right shoulder pain that later warranted a right shoulder decompression procedure, at the time Dr. Chiappetta offered his opinion, his treatment of the plaintiff focused on the plaintiff's recovery following his hip surgery. Moreover, as discussed above, the plaintiff had significant improvement in his shoulder following the surgery and, notwithstanding the post-surgical improvement, the ALJ's RFC includes upper extremity limitations such that the plaintiff is restricted to "only frequent overhead reaching with the right dominant upper extremity." (Tr. 22). Accordingly, the ALJ did not err in his treatment of Dr. Chiappetta's opinion, and he properly explained his reasons for assigning his opinion "little weight."

Next, in his decision, the ALJ addressed the October 2015 opinion of APRN Putnam, which was later co-signed in April 2016 by Dr. Grahling. (Tr. 28). The ALJ acknowledged that APRN Putnam's opinion was entitled to "some consideration under the guidance of [Social Security Ruling] 06-[]3p,"[13] and then proceeded to explain why he concluded that APRN Putnam's opinion was entitled to "little weight[.]" (Tr. 28).

As discussed above, the plaintiff has a long treatment history with Dr. Grahling and APRN Putnam, including receiving a series of facet joint injections, medial branch blocks, and radio frequency ablations. They also managed his medication and prescribed a TENS unit. (*See* Tr. 472-74); *see* Section II.B.1-2. *supra*. As the ALJ noted, in APRN Putnam's October 26, 2015 medical source statement, he opined that the plaintiff could lift or carry 10 pounds continuously, and 20 pounds occasionally; could sit for 30 minutes, and stand or walk for 15 minutes at a time; and could sit for four hours in a work day, stand for one hour, and walk for 30 minutes, but the remaining time in the work day would be spent lying down. (Tr. 740-41, 820-11). Additionally, APRN Putnam opined as to the plaintiff's limitations in his upper body, and that the plaintiff could not sit in one position for too long (Tr. 742, 822), and he could never climb, stoop, kneel, crouch or crawl, and could occasionally climb stairs or balance; these activities were limited secondary to pain. (Tr. 743, 823). On April 14, 2016, Dr. Grahling and APRN Putnam co-signed a medical

---

[13] As explained in SSR 06-3p, opinions from APRNs, even though they do not qualify as "acceptable medical sources[,]" are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." Social Security Ruling ["SSR"] 06-3p, 2006 WL 2329939, *3 (S.S.A. Aug. 9, 2006). These "[o]pinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *5. When analyzing these opinions, however, ALJs must apply the same factors used to evaluate "acceptable medical sources" such as the length of the treating relationship and how frequently the source has seen the individual, the degree to which the opinion is consistent with other evidence in the record, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the individual's impairments, and any other factors that tend to support or refute the opinion. *Id.* at *4.

source statement on behalf of the plaintiff which was identical to the form signed by only APRN Putnam on October 26, 2015, with the addition that the limitations noted in April 14th statement refer back to at least March 2012. (Tr. 820-26).

Although the plaintiff is correct that Dr. Grahling and APRN Putnam's long treatment history of the plaintiff would render them aware of their physical findings on examination, which they would incorporate into their medical opinion (Pl.'s Mem. at 15-16 & n. 9), the underlying records, as the ALJ also noted, do not reflect the level of functional limitations that would be consistent with these treating providers' opinions, nor do they reflect the severity of findings on physical and neurological examinations. Rather, the records reflect that, although the plaintiff did not have complete relief from his injections, he often reported improvement in his pain and functioning, and increased range of motion from the injections, medication, and the TENS unit. (*See, e.g.*, Tr. 706, 726, 806 (felt better "initially")).    Upon examination, APRN Putnam often noted that the plaintiff suffered from "mild" tenderness and pain in his back (*see, e.g.*, Tr. 558, 706), and APRN Putnam and Dr. Grahling opined that the plaintiff's MRI "look[ed] pretty good, [with] min[imal] protrusion at L2-3." (Tr. 807, 808).   Additionally, in February 2016, when the plaintiff no longer received any relief from the injections, APRN Putnam recommended that the plaintiff continue medication management, in coordination with the plaintiff's routine of walking on a treadmill daily and using a TENS unit.  (Tr. 811, 813).  In light of these treatment records, the ALJ accurately concluded that the "functional limitations [identified in APRN Putnam and Dr. Grahling's opinion] are inconsistent with the record as a whole, in particular with the overall mild nature of the impairments in the claimant's lumbar and thoracic spine." (Tr. 28).   The ALJ explained that APRN Putnam and Dr. Grahling's opinion is "inconsistent with the overall mild findings on physical examination, and generally normal findings on neurological examination."

(Tr. 28). The ALJ appropriately considered the consistency of the medical opinion with the underlying treatment records and explained the inconsistency in his decision. 20 C.F.R. § 404.1527(c)(2); *Selian*, 708 F.3d at 417.

In discounting the opinion of Dr. Grahling and APRN Putnam, the ALJ appropriately considered the activities that the plaintiff was able to perform, including driving, some grocery shopping, preparing meals, and some house cleaning. *See Roma v. Astrue*, 468 F. App'x 16, 19 (2d Cir. Jan. 19, 2012) (holding that the ALJ did not err in declining to accord controlling weight to a treating physician's opinion that conflicted with claimant's testimony that he could perform a broad range of activities, including driving, reading, sending email, and independently performing the activities of daily living). The ALJ also noted the 24-hours of activity that the plaintiff reported when wearing a Holter monitor in December 2014: folding laundry, going to the "workshop," walking 10-steps, going on two one-mile walks, going to the doctor, wrapping gifts, vacuuming rugs, cleaning the bathroom, and mopping the floors. (Tr. 28; s*ee* Tr. 624). After considering the foregoing, the ALJ properly explained that Dr. Grahling and APRN Putnam's opinion was "inconsistent" with the plaintiff's reported activities. (Tr. 28). Accordingly, the ALJ did not err in his treatment of Dr. Grahling and APRN Putnam's opinions.

The plaintiff argues that the ALJ failed to assign significant weight to the opinion of Dr. Pesce and erred by not identifying "good reasons" for affording only "some" weight to his opinion. (Pl.'s Mem. at 16-17). In his decision, the ALJ addressed Dr. Pesce's opinion that it was "highly unlikely that [the plaintiff] could return to his previous employment or any employment that would involve repetitive bending, stooping, standing, or sitting for long periods." (Tr. 29; *see* Tr. 853). The ALJ afforded "partial weight" to this opinion given that it was "not a function-by-function assessment" and was "vague in its description of the claimant's limitations[,]" but the ALJ also

noted that the opinion was "generally consistent with the claimant's [RFC]." (Tr. 29). The ALJ appropriately relied on the objective medical evidence in concluding that the opinion regarding the plaintiff's postural limitations is "generally consistent with the level of damage found on imaging[,]" and with the "findings on physical and neurological examination[s.]" (Tr. 29).

Dr. Pesce's underlying records reveal that the plaintiff had "negative seated straight leg raise" and that the plaintiff reported that his pain was "minimal" during periods of sitting and rest, and worsened with activity. (Tr. 815). Dr. Pesce's records also reveal that the plaintiff reported improvement with his medication and that he had functional range of motion of the thoracolumbar spine, some pain at end range of flexion and extension, and diffuse tenderness along the mid thoracic and lumbar paraspinals with trigger points along this area but no spasm. (Tr. 817). Additionally, Dr. Pesce's notes reflect that the plaintiff, in Dr. Pesce's words, was "generally doing well with regard to thoracolumbar disease and hip arthritis." (Tr. 817; *see* Tr. 818, 850 (overall, the plaintiff was generally doing well)). The plaintiff reported to Dr. Pesce that he was driving, was independent with simple activities of daily living, and ambulated without an assistive device. (Tr. 818, 850). The ALJ incorporated into his RFC assessment the limitation of "occasional balancing, stooping, kneeling, crouching and crawling," which conclusion is consistent with Dr. Pesce's opinion. (Tr. 22). Accordingly, the ALJ did not err in his treatment of Dr. Pesce's opinion.

Additionally, as the defendant correctly contends, the ALJ's opinion is supported by the opinions the State Agency consultants' opinions. (Tr. 29). On September 26, 2014, Dr. Virginia Rittner completed a Physical Residual Functional Capacity Assessment of the plaintiff in connection with his application for benefits. (Tr. 92-93). She concluded that the plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds, and could stand, walk or sit for about 6 hours in an 8-hour day. (Tr. 92). Additionally, the plaintiff could

occasionally climb ramps and stairs; balance; stoop; climb ladders, ropes and scaffolds; kneel; crouch; and crawl. (Tr. 93). On December 29, 2014, Dr. Earle Sittambalam completed a Physical Residual Functional Capacity Assessment which he reached identical conclusions as Dr. Rittner, with the exception of the conclusion that the plaintiff could never climb ladders, ropes, or scaffolds. (Tr. 104-05).

The Second Circuit has recognized that "[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source." *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993). However, the opinions of non-examining sources may "override treating sources' opinions, provided they are supported by evidence in the record." *Id.* (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)). The ALJ afforded these opinions "great weight[,]" explaining that they are "generally consistent with the severity of the claimant's orthopedic impairment as shown through medical imaging and results of physical and neurological examinations." (Tr. 29, citing Tr. 404, 470-71, 493, 515, 569-70, 702, 706, 726, 769-97, 802, 806-07, 815-19). In this case, in assigning "great weight" to the opinions of these State Agency consultants, the ALJ properly explained that the "totality of the medical records show[ed] significant improvement in the claimant's hip and shoulder impairments following surgical intervention, good response in the claimant's spinal impairments with treatment, and [the] overall mild nature of damage in the claimant's thoracic and lumbar spine as shown through imaging." (Tr. 29); *see Burgess*, 537 F.3d at 129-30 (quoting *Snell,* 177 F.3d at 133).

Accordingly, the ALJ did not err in his treatment of the treating physicians' opinions, and in turn, his RFC assessment, as discussed above, is supported by substantial evidence. *See Hanson v. Comm'r of Soc. Sec.*, No. 3:15 CV 0150(GTS)(WBC), 2016 WL 3960486, at *12 (N.D.N.Y.

June 29, 2016) ("Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence . . . Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record."), *report and recommendation adopted sub nom. Hanson v. Colvin*, No. 3:15 CV 150(GTS)(WBC), 2016 WL 3951150 (N.D.N.Y. July 20, 2016).

C.     THE ALJ FULLY DEVELOPED THE RECORD

Finally, the plaintiff contends that the ALJ erred in failing to develop the record after "reject[ing]" the "treating physicians' opinion . . . due to perceived inconsistencies in the record." (Pl.'s Mem. at 18-19). However, as discussed above, the ALJ discussed the treatment records that were inconsistent with the treating physicians' opinions and explained these inconsistencies when detailing why he did not assign controlling weight to these opinions. (Tr. 28-29). That is precisely what the ALJ is required to do. *See Burgess,* 537 F.3d at 128 (holding that treating physician opinions are entitled to controlling weight if "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[]'") (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). Moreover, where "the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity . . . a medical source statement or formal medical opinion is not necessarily required[.]" *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x. 5, 8 (2d Cir. 2017) (citations omitted). In such a case, the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013).

In this case, there was sufficient evidence, as discussed above, including opinions from several medical sources, from which the ALJ could reach a conclusion as to the plaintiff's RFC. Moreover, the ALJ's decision is subject to deference provided that he provides specific reasons

for his determination, and the "record evidence permits [the Court] to glean the rationale of the ALJ's decision[.]" *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order). Accordingly, the Court finds that substantial evidence, as discussed throughout this decision, supports the ALJ's RFC determination and the ALJ did not err in failing to develop the record.

VI.    <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 24) is *denied*, and the defendant's Motion to Affirm (Doc. No. 29) is *granted*.

Dated this 15th day of November 2018 at New Haven, Connecticut.

<u>_/s/Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge